**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

MARTHA BAZA,

                                   Plaintiff,                    Civil Action No. 1:24-cv-953

v.

NEWREZ LLC d/b/a SHELLPOINT MORTGAGE
SERVICING,

                                   Defendant.

## COMPLAINT

Plaintiff Martha Baza, by counsel, files this Complaint against NewRez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint"). Ms. Baza alleges as follows:

## PRELIMINARY STATEMENT

1.      This case demonstrates that, as the entities that perform the day-to-day management of loans, "servicers can have a direct and profound impact on borrowers."[1] Here, even though Ms. Baza paid her mortgage, including her tax and insurance obligations, as required by her note and deed of trust, her mortgage servicer mismanaged almost every aspect of her loan, ultimately resulting in the improper foreclosure of her home.

2.      For example, even though Ms. Baza is exempt from paying personal property taxes in Fairfax County, Shellpoint paid Fairfax County more than $1,500 property taxes, which it took from Ms. Baza's escrow account, causing a large escrow shortage.

---

[1] *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, 10699 (Feb. 14, 2013) (codified at 12 C.F.R. pt 1024).

3.     Shellpoint then applied Ms. Baza's payments towards her escrow shortage—not her monthly principal and interest payments—and marked Ms. Baza as delinquent.

4.     And when Fairfax County returned the tax payment to Shellpoint, Shellpoint placed the refund in Ms. Baza's escrow account and told her that it would not send her the escrow overage until she brought her loan "current."

5.     Compounding this issue, Shellpoint also assessed lender-placed insurance to Ms. Baza's loan, which was inappropriate because Ms. Baza has her own homeowner's insurance policy and is also covered by a master policy that her condominium association maintains.

6.     When Ms. Baza provided proof of her insurance to Shellpoint, Shellpoint refused to remove the lender-placed insurance from Ms. Baza's loan.

7.     Ms. Baza continued to pay her monthly mortgage payment each month, but could not afford the inflated amounts that Shellpoint insisted that she pay. As a result, Shellpoint continued to mark her more delinquent each month.

8.     Eventually, Shellpoint started rejecting her payments completely and foreclosed on her home.

9.     Eventually realizing its mistake in handling her loan, Shellpoint rescinded the foreclosure sale, but refused to acknowledge that Ms. Baza was current on her loan.

10.    Ms. Baza has disputed Shellpoint's inaccurate loan servicing by submitting Qualified Written Requests to Shellpoint and dispute letters to the consumer-reporting agencies, but Shellpoint still refuses to correct her mortgage account.

11.    A homeowner should not have to file a lawsuit to correct her loan servicer's accounting error. Indeed, Congress enacted the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617 to protect consumers from this type of abusive and inaccurate servicing

practice. RESPA imposes mandatory duties on mortgage servicers, including investigative duties when responding to a borrower's belief that his account is in error. 12 U.S.C. § 2605.

12.     In this case, had Shellpoint simply complied with its RESPA obligations, it would have corrected the error on Ms. Baza's account and prevented the damages that Ms. Baza incurred due to Shellpoint's conduct. As a result, Ms. Baza alleges claims against Shellpoint under RESPA, 12 U.S.C. § 2605.

13.     RESPA provides for actual damages, statutory damages, costs, and attorney's fees for violations of certain mortgage servicer duties. The imposition of civil liability on servicers for the damage caused by their violations of the requirements of RESPA is essential to achieve RESPA's consumer-protection purposes because home mortgage servicers are incentivized "to look for opportunities to impose fees on borrowers to enhance revenues."[2] Indeed, this case exemplifies the type of far-reaching consequences noncompliance with RESPA can have on a homeowner. Here, Shellpoint has profited from assessing late fees on Ms. Baza's account, while reporting derogatory and inaccurate information concerning him to the credit bureaus.

14.     The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x, provides additional protections to consumers that are designed to protect the furnishing of derogatory, erroneous information by their mortgage servicer by imposing further investigative duties on servicers after the homeowner disputes the inaccuracy with the credit bureaus. 15 U.S.C. § 1681s-2(b)(1).

15.     Because Shellpoint has refused to correct its inaccurate reporting after multiple disputes by Ms. Baza, Ms. Baza also alleges FCRA claims for Shellpoint's failure to fully and

---

[2] *Id.*

properly investigate her disputes and to review all relevant information provided by the consumer reporting agencies.

16.     Finally, Ms. Baza alleges claims against Shellpoint under the Truth in Lending Act ("TILA") for failing to properly credit her payments on the date that it received them.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction under 28 U.S.C. § 1331, 12 U.S.C. § 2605(f), and 15 U.S.C. § 1681(p).

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that form the basis of this Complaint occurred here.

## PARTIES

19.     Plaintiff Martha Baza is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

20.     Shellpoint is a limited liability company that acted as Plaintiff's mortgage servicing company with a principal place of business in South Carolina. At all times relevant to this Complaint, Shellpoint was a mortgage loan servicing company governed by RESPA and a furnisher governed by the FCRA.

## FACTS

### *Shellpoint's Mortgage Servicing Business*

21.     Shellpoint is one of the largest mortgage servicers in the United States of America.

22.     As is customary in the mortgage lending industry, a borrower, like Ms. Baza, has no say in who services her mortgage loan.

23.     As a mortgage servicer, Shellpoint manages the day-to-day aspects of consumers' mortgage loans, including collecting and applying monthly payments, maintaining escrow

accounts, communicating with borrowers about their loans, reporting payment information to various credit bureaus, and managing the foreclosure process when a consumer becomes delinquent.

24.     Pertinent to this litigation, Shellpoint manages escrow accounts for the mortgages that it services. A mortgage escrow account is "a trust account set up in a borrower's name to ensure the timely payment of specified obligations affiliated with a property." H.R. Rep. No. 111-94, at 53 (2009).

25.     Under escrow agreements, which are often required by borrowers' deeds of trust, borrowers pre pay a set amount into their escrow accounts on a regular, typically monthly, basis. *Id.* Lenders "then use these collected sums to guarantee the timely payment of property tax bills and insurance premiums." *Id.* By guaranteeing timely payment, lenders protect themselves and the borrowers from tax liens and property damage risk. *Id.* When the mortgage contract ends, any money remaining in escrow is returned to the borrower.

26.     Shellpoint receives significant servicing income from interest earned on borrowers' tax and insurance payments, which are held in an escrow account between the time the payments are collected and the time they are paid out to the appropriate insurance or taxing authority. A substantial part of Shellpoint's servicing revenue, therefore, is dependent on escrow disbursement timing, escrow analysis, and escrow cushion requirements. Adam J. Levitin & Tara Twomey, *Mortgage Servicing*, Georgetown Law and Economics Research Paper No. 11-01 (Dec. 15, 2010) at 39 (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1324023).

27.     This float income can be very profitable. For example, Countrywide Mortgage reported holding $19.2 billion in borrower and investor custodial cash accounts at the end of December 2007, which produced significant float income via interest earned on those accounts.

*Id.* at 40 (citing Countrywide Fin. Corp., Annual Report (Form 10-K) F-99 (Feb. 29, 2008), available at http://www.secinfo.com/dVut2.t21n.htm.)

28.     Shellpoint also makes servicing income from assessing and collecting late fees, foreclosure fees, and other default-related fees to borrowers' accounts. *Id.*  at 41. Under most servicing agreements, Shellpoint is allowed to keep all of these fees for itself and does not have to pay them to the owner of the mortgage. *Id.*  at 41.

29.     These fees are likewise highly profitable for mortgage servicers. Countrywide collected almost ten percent—or approximately two hundred and eighty-seven million—of its $2.876 billion servicing revenue from late fees alone in 2006. *Id.* at 42.

30.     Shellpoint is, therefore, financially motivated to require consumers to maintain as large an escrow balance as possible, and to aggressively enforce the balance of escrow accounts through late fees and other default-related charges.

### *Ms. Baza Purchases Her Home*

31.     Ms. Baza purchased a condominium unit in Fairfax County, Virginia in 1998, which she has used as her primary residence ever since.

32.     Ms. Baza refinanced the mortgage on her home in 2012.

33.     Ms. Baza's refinanced mortgage is secured by a Deed of Trust.

34.     Ms. Baza is exempt from property taxes in Fairfax County because of her age and income.

35.     Ms. Baza has always maintained homeowners' insurance on her condominium— including an individual policy and a master policy that is paid through her condominium association.

36.     Shellpoint acquired the servicing rights to Ms. Baza's mortgage loan on June 1, 2018.

37.     Shellpoint has mismanaged Ms. Baza's loan from the very beginning.

### Shellpoint Charges Ms. Baza Taxes that She Does Not Owe

38.     Starting in 2018, Shellpoint started assessing property tax charges to Ms. Baza's loan.

39.     Ms. Baza was eventually able to resolve the issue after working with an attorney at Legal Services of Northern Virginia.

40.     Ms. Baza believed that the issue was resolved.

41.     Indeed, from January through June 2020, Shellpoint collected a monthly escrow payment from Ms. Baza of approximately $25 per month.

42.     Then, despite Ms. Baza's tax-exempt status, on July 28, 2020, Shellpoint sent a tax payment of $1,571.22 to Fairfax County for property taxes on Ms. Baza's condominium.

43.     This payment was made using funds in Ms. Baza's escrow account.

44.     To be clear, this money was not owed to Fairfax County because Ms. Baza was tax exempt.

45.     Ms. Baza never authorized Shellpoint to pay these funds to Fairfax County out of her escrow account.

46.     Shellpoint's improper payment to Fairfax County caused a large deficiency in Ms. Baza's escrow account.

47.     To make up for this shortage, Shellpoint increased Ms. Baza's monthly escrow payment to $503 per month, which she could not afford on a fixed income.

48.     And when Ms. Baza paid the amount actually due on her mortgage loan, without the improper escrow charges, Shellpoint marked her loan as delinquent and started placing her monthly payments in a suspense account without applying them to her loan.

49.     On December 4, 2020, Fairfax County returned the improper property tax payment to Shellpoint.

50.     But instead of correcting the improper escrow charges on Ms. Baza's loan. Shellpoint placed this refund into Ms. Baza's escrow account.

51.     Shellpoint then informed Ms. Baza that there was an overage in her escrow account, but that it could not provide her with an overage payment until she brought her loan current.

52.     But Ms. Baza was not delinquent because she had been paying the amount actually due on her loan each month.

53.     Even worse, Shellpoint continued to bill Ms. Baza the inflated $503 escrow charge each month until April 2021, when it completed a new escrow analysis.

54.     Shellpoint's refusal to correct Ms. Baza's escrow account caused Ms. Baza to fall further behind each month, even though she continued to pay her monthly mortgage payment as required by her Note and Deed of Trust.

### *Shellpoint Also Charges Ms. Baza Inappropriate Lender-Placed Insurance Charges*

55.     Compounding this issue, Shellpoint also refused to acknowledge Ms. Baza's homeowner's insurance, which she paid separately. Ms. Baza maintained both her own personal homeowner's policy, and her condominium was also insured through a master policy paid by her condominium association.

56.     Shellpoint first added lender-placed insurance to Ms. Baza's loan in approximately April 2021.

57.     After assessing the first lender-placed insurance policy to Ms. Baza's loan, Shellpoint renewed the policy every six months.

58.     Ms. Baza disputed the assessment of forced-placed insurance with Shellpoint many times.

59.     Ms. Baza called and informed Shellpoint of her insurance policy, including the master policy through her condominium association, several times.

60.     Ms. Baza also mailed Shellpoint proof of insurance, including the master policy, on October 4, 2022.

61.     But Shellpoint continued to assess lender-placed insurance to Ms. Baza's loan after she submitted the master policy, including in June 2023.

62.     Despite providing proof of insurance coverage several times, Shellpoint refused to cancel the lender-placed insurance until September 5, 2023.

### *Shellpoint Forecloses on Ms. Baza's Home*

63.     In the meantime, Shellpoint's erroneous assessment of taxes and lender-placed insurance caused Ms. Baza to fall farther behind, even though she continued to submit mortgage payments each month.

64.     Shellpoint referred Ms. Baza's loan to foreclosure, started rejecting her mortgage payments, and ultimately foreclosed on her home.

65.     The public auction of the home occurred on August 15, 2023 and the Trustee's Deed was recorded in Fairfax County land records on August 31, 2023.

66.     The foreclosure sale was ultimately rescinded on September 23, 2023, presumably because of Shellpoint's multiple servicing errors.

67.     But even though it acknowledged that the foreclosure should not have occurred, Shellpoint still refused to consider Ms. Baza's loan current.

### Shellpoint Ignores Ms. Baza's Qualified Written Requests

68.     On October 13, 2023, Ms. Baza sent a Qualified Written Request to Shellpoint.

69.     This letter contained all of the information necessary to be considered a Qualified Written Request, including information sufficient to identify her loan.

70.     Ms. Baza sent her Qualified Written Request to the address that Shellpoint has designated for these correspondences.

71.     Ms. Baza's Qualified Written Request notified Shellpoint of three errors.

72.     First, it stated that she was not past due. The letter explained that Ms. Baza had made timely mortgage payments each month, and that Shellpoint improperly applied the payments to escrow charges that she did not owe. The letter asked Shellpoint to confirm that all late charges and default-related fees had been removed from the account, and confirm the exact amount needed to bring the loan current, since Shellpoint rejected her payments from July through September 2023.

73.     Second, Ms. Baza's Qualified Written Request asked Shellpoint to send her an updated escrow disclosure so that she could confirm that she was no longer being charged for lender-placed insurance or property taxes.

74.     Third, Ms. Baza asked that Shellpoint delete any derogatory credit reporting about her account.

75.     Finally, Ms. Baza's Qualified Written Request also asked Shellpoint to provide the servicing notes for her loan and the identity of all lenders of her loan, as well as the dates that they owned her loan.

76.     Shellpoint acknowledged receipt of Ms. Baza's Qualified Written Request on October 19, 2023.

77.     Shellpoint responded to Ms. Baza's Qualified Written Request on November 2023.

78.     Shellpoint's response was deficient in several respects.

79.     First, Shellpoint stated that the principal balance of Ms. Baza's loan was $0.00, as her home was sold at foreclosure on August 15, 2023.

80.     Second, Shellpoint's response did not address any of the late fees or charges assessed to Ms. Baza's loan.

81.     Finally, Shellpoint refused to acknowledge that its credit reporting was inaccurate and maintained that Ms. Baza has been delinquent on the loan since 2020.

82.     Each of these findings was caused by Shellpoint's refusal to conduct an investigation into Ms. Baza's dispute. Had Shellpoint investigated, it would have seen its clear servicing errors and corrected Ms. Baza's account.

83.     Shellpoint also refused to provide Ms. Baza with the servicing notes or the lender history for her loan.

84.     Ms. Baza sent a follow-up Qualified Written Request to Shellpoint on December 1, 2023.

85.     This letter contained all of the information necessary to be considered a Qualified Written Request, including information sufficient to identify her loan.

86.     Ms. Baza sent her follow-up Qualified Written Request to the address that Shellpoint has designated for these correspondences.

87.     Ms. Baza's follow-up Qualified Written Request notified Shellpoint of three servicing errors.

88.     First, Ms. Baza asked Shellpoint to confirm that the recession deed for her home had been filed. She also asked Shellpoint to removed any default-related charges and late fees from her loan and to confirm the amount required to bring her loan current given Shellpoint's rejection of her payments from July to September 2023.

89.     Second, Ms. Baza's follow-up Qualified Written Request asked Shellpoint to send her an updated escrow disclosure so that she could confirm that she was no longer being charged for lender-placed insurance or property taxes.

90.     Third, Ms. Baza asked that Shellpoint delete any derogatory credit reporting about her account.

91.     Finally, Ms. Baza's follow-up Qualified Written Request also asked Shellpoint to provide the servicing notes for her loan.

92.     Shellpoint received Ms. Baza's follow-up Qualified Written Request on December 4, 2023.

93.     Ms. Baza never received a response to her follow-up Qualified Written Request.

94.     Ms. Baza sent a third Qualified Written Request to Shellpoint on February 9, 2024.

95.     This letter contained all of the information necessary to be considered a Qualified Written Request, including information sufficient to identify her loan.

96.     Ms. Baza sent her third Qualified Written Request to the address that Shellpoint has designated for these correspondences.

97.     Ms. Baza's third Qualified Written Request contained three notices of error similar to the ones raised by her previous Qualified Written Requests.

98.     Ms. Baza's third Qualified Written Request also asked Shellpoint to provide her with an updated escrow disclosure, her servicing notes, all correspondence with Shellpoint's

foreclosure firm about the rescission, and her payment history from December 2020 through the present.

99.    Shellpoint received Ms. Baza's third Qualified Written Request on February 19, 2024.

100.    Shellpoint never responded to Ms. Baza's third Qualified Written Request.

***Shellpoint Refuses to Correct its Inaccurate Credit Reporting about Ms. Baza's Loan***

101.    Shellpoint also reported Ms. Baza's mortgage as severely delinquent to the consumer-reporting agencies.

102.    Again, this reporting was inaccurate. Ms. Baza paid the amount that was due on her mortgage each month and made those payments on time. The error stemmed from Shellpoint's inaccurate assessment of property taxes and lender-placed insurance on her loan.

103.    In October 2023, Ms. Baza submitted disputes to Equifax, Experian, and Trans Union disputing Shellpoint's inaccurate reporting of her mortgage as delinquent. She explained that she had made timely mortgage payments each month and that Shellpoint was charging her for taxes and insurance that she did not owe. Ms. Baza included proof of her monthly payments, her tax exemptions, and her insurance policies to her dispute.

104.    Upon information and belief, the consumer-reporting agencies forwarded this information to Shellpoint.

105.    Shellpoint failed to adequately investigate Ms. Baza's dispute and instead verified the derogatory payment history and past due balance as correct.

106.    Ms. Baza continued to dispute the inaccurate Shellpoint reporting with the consumer-reporting agencies over the next several months.

107.    She submitted follow-up disputes in November 2023, December 2023, and February 2024.

108.    Each of these disputes explained that she had made timely monthly payments on her mortgage and should not be considered late.

109.    Each of the disputes also attached supporting documents showing that Shellpoint's reporting was inaccurate.

110.    Upon information and belief, the consumer-reporting agencies forwarded each of Ms. Baza's disputes to Shellpoint.

111.    Shellpoint failed to adequately investigate Ms. Baza's dispute and instead verified the derogatory payment history and past due balance as correct in response to each of Ms. Baza's disputes.

112.    Ms. Baza's credit reports are still inaccurate.

113.    As a result of Shellpoint's conduct, Ms. Baza suffered actual damages. For example, her credit score was reduced, improper late fees and other improper charges were added to her loan balance, and Ms. Baza feared that her home would be foreclosed on again. This caused Ms. Baza significant emotional distress.

114.    Shellpoint's processing of consumer disputes was willful and carried out in reckless disregard for a consumer's rights under the FCRA. In fact, Shellpoint acted in accordance with Shellpoint's intended procedures. In addition, Shellpoint prioritizes processing disputes quickly over making sure that the disputes are investigated thoroughly and accurately.

115.    In addition, the willfulness of Shellpoint's FCRA violations can be established by, for example:

a. Congress enacted the FCRA in 1970, and Shellpoint has had over 50 years to become compliant;

b. Shellpoint is a corporation with access to legal advice through its own general counsel and outside litigation counsel. Yet, there is not contemporaneous evidence that Shellpoint determined that its conduct was lawful;

c. Shellpoint knew, or had reason to know, that its conduct was inconsistent with the FCRA's plain language, regulatory guidance, and the relevant case law;

d. Shellpoint voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading of the statute that was merely careless;

e. Shellpoint's FCRA violations were repeated and systematic;

f. Shellpoint had substantial documentation available to it that apprised it of its duties under the FCRA but still chose not to comply with the statute; and

g. Shellpoint had notice of its defective dispute processing procedures through internal audits and litigation, but chose not to meaningfully change its policies and procedures to comply with the FCRA.

**<u>COUNT ONE</u>:**
**Violation of RESPA, 12 U.S.C. § 2605(l)(3)**

116.   Ms. Baza incorporates the preceding allegations.

117.   As alleged above, Ms. Baza provided Shellpoint with proof of existing insurance coverage multiple times, including in October 2022.

118.   Despite this, Shellpoint did not terminate the force-placed insurance on Ms. Baza's mortgage until September 5, 2023.

119.   Even worse, Shellpoint has still not corrected the late fees and other charges associated with its assessment of the force-placed insurance.

15

120.    Shellpoint's failure to terminate the force-placed insurance policy within 15 days of receiving confirmation of Ms. Baza's existing insurance coverage and refund Ms. Baza all fees related to the force-placed insurance policy violated 12 U.S.C. § 2605(l)(3).

121.    As a result of Shellpoint's conduct, Ms. Baza suffered concrete and particularized harm, including: the foreclosure of her home, the assessment of fees that she did not owe, a decreased credit score, and emotional distress, including aggravation and stress.

122.    Upon information and belief, discovery will demonstrate that Shellpoint's noncompliance with 12 U.S.C. § 2605(l) is a part of a pattern or practice of noncompliance with this statutory provision, including because this conduct was a result of Shellpoint's standard procedures applied to thousands of consumers in the last several years.

123.    Shellpoint has also been sued for similar conduct before. *Sims v. NewRez, LLC*, 1:21-cv-3011 (N.D. Ga.).

124.    Ms. Baza is entitled to recover actual damages, statutory damages, costs, and attorney's fees from Shellpoint for each of its violations of 12 U.S.C. § 2605(k) under 12 U.S.C. § 2605(f).

**COUNT TWO:**
**Violation of RESPA, 12 U.S.C. § 2605(e)(2)**

125.    Ms. Baza incorporates the preceding allegations.

126.    As alleged above, Ms. Baza submitted three qualified written requests to Shellpoint, and Shellpoint received the requests.

127.    Shellpoint violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to Ms. Baza's account, including removing all late fees and charges related to the force-placed insurance and property taxes and correcting the inaccurate credit reporting regarding the loan.

128.    Shellpoint also violated 12 U.S.C. § 2605(e)(2) by failing to provide Ms. Baza with most of the information she requested or to explain why the requested information was unavailable.

129.    As a result of Shellpoint's conduct, Ms. Baza suffered concrete and particularized harm, including: a decreased credit score, the assessment of fees that she did not owe, and emotional distress, including aggravation and stress.

130.    Upon information and belief, discovery will reveal that Shellpoint's noncompliance with 12 U.S.C. § 2605(e)(2) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e). For example, the Consumer Financial Protection Bureau's consumer complaint portal shows that 10,451 complaints have been filed against Shellpoint as of May 21, 2024, including 288 complaints for failing to investigate an existing problem.

131.    Ms. Baza is entitled to recover actual damages, statutory damages, costs, and attorney's fees from Shellpoint for each of its violations of 12 U.S.C.§ 2605(e)(2) under 12 U.S.C. § 2605(f).

**COUNT THREE:**
**Violation of RESPA, 12 U.S.C. § 2605(e)(3)**

132.    Ms. Baza incorporates the preceding allegations.

133.    Shellpoint violated 12 U.S.C. § 2605(e)(3) by continuing to provide derogatory information regarding the "late" payments during the 60-day period after Shellpoint received Ms. Baza's Qualified Written Requests, including dispute responses to the consumer-reporting agencies and monthly credit reporting updates.

134.    Because of Shellpoint's conduct, Ms. Baza suffered concrete and particularized harm, including the reduction of her credit score and emotional distress, including stress and aggravation.

135.     Upon information and belief, discovery will demonstrate that Shellpoint's noncompliance with 12 U.S.C. § 2605(e)(3) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e), including because this conduct was a result of Shellpoint's standard procedures that was used in responding to all Qualified Written Requests.

136.     Upon information and belief, Shellpoint does not have a procedure in place to freeze negative payment information when it receives a Qualified Written Request challenging the validity of the payment information.

137.     Ms. Baza is entitled to recover actual damages, statutory damages, costs, and attorney's fees from Shellpoint for its violations of 12 U.S.C. § 2605(e)(3) under 12 U.S.C. § 2605(f).

## COUNT FOUR:
### Violation of TILA, 15 U.S.C. § 1639f and 12 C.F.R. § 1026.36(c)(1)

138.     Ms. Baza incorporates the preceding allegations.

139.     On one or more occasions within the past year, Shellpoint violated 15 U.S.C. § 1639f and 12 C.F.R. § 1026.36(c)(1) by failing to credit Ms. Baza's mortgage payments on the date that it received them and instead returned the payments to Ms. Baza.

140.     As a result of Shellpoint's violations of 15 U.S.C. § 1639f and 12 C.F.R. § 1026.36(c)(1), Ms. Baza suffered concrete and particularized harm, including but not limited to improper fees and charges and the foreclosure of her home.

141.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Shellpoint in an amount to be determined under 15 U.S.C. § 1640.

## COUNT FIVE:
### VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(A)

142.     Ms. Baza incorporates the preceding paragraphs.

143.    On one or more occasion within the past two years, Shellpoint violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Ms. Baza's disputes.

144.    When Ms. Baza disputed the account with the credit bureaus, Shellpoint used a dispute system named "e-Oscar," which is an automated system that the consumer-reporting agencies have developed to quickly transmit disputes to furnishers.

145.    E-Oscar is an automated system, and the procedures used by the credit reporting agencies are systematic and uniform.

146.    E-Oscar's dispute processing is systemic and uniform: when the credit reporting agencies receive consumer disputes, they (usually via an outsourced vendor) translate each dispute into an automated consumer dispute verification ("ACDV") form.

147.    Upon information and belief, the ACDV form is way that Shellpoint has elected to receive consumer disputes under 15 U.S.C. § 1681i(a).

148.    Upon information and belief, the credit reporting agencies forwarded Ms. Baza's disputes by ACDVs.

149.    Shellpoint understood the nature of Ms. Baza's disputes when it received the ACDV forms.

150.    Upon information and belief, when Shellpoint received the ACDV form containing Ms. Baza's disputes, it followed a standard and systematically unlawful process where it only reviewed its own internal computer screen for the account and repeated back the same information to the ACDV system that was previously reported to the credit reporting agency.

151.    Upon information and belief, when Shellpoint receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether there is

information already in its computer system that would demonstrate the disputed information is misleading or inaccurate.

152.    Because of Shellpoint's violation of 15 U.S.C. § 1681s-2(b)(1)(A), Ms. Baza suffered actual damages, including a reduced credit score, embarrassment, humiliation, stress, and other emotional distress.

153.    Shellpoint's conduct in violating 15 U.S.C. § 1681s-2(b)(1)(A) was willful, rending it liable to Ms. Baza for punitive damages under 15 U.S.C. § 1681n. In the alternative, Shellpoint was negligent, entitling Ms. Baza to recovery under 15 U.S.C. § 1681o.

## COUNT SIX:
## VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(B)

154.    Ms. Baza incorporates the preceding allegations.

155.    On one or more occasion within the past two years, Shellpoint violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the credit reporting agencies.

156.    As Ms. Baza detailed in the previous Count, Shellpoint has elected to use the e-Oscar system for its FCRA disputes from the consumer reporting agencies.

157.    When it received the ACDV forms from the credit-reporting agencies, Shellpoint did not review any of the information that Ms. Baza included in her dispute, which demonstrated that Shellpoint's reporting of the account was inaccurate.

158.    If Shellpoint had reviewed this information, it would have known that its previous reporting was incorrect and needed to be updated.

159.    Shellpoint also ignored the other information that the consumer-reporting agencies provided on Ms. Baza's disputes, including the two-digit dispute code that the agencies listed on the ACDV form.

160.     Shellpoint knew the meaning of the dispute codes used by the consumer-reporting agencies in e-Oscar.

161.     Shellpoint does not contend that the ACDV system is an inadequate means to receive FCRA disputes from the consumer-reporting agencies.

162.     Shellpoint understood Ms. Baza's disputes and that she was disputing the late payment history that Shellpoint was reporting.

163.     Despite this, Shellpoint did not update its incorrect reporting regarding the accounts and continued its inaccurate reporting about Ms. Baza.

164.     Because of Shellpoint's 15 U.S.C. § 1681s-2(b)(1)(B) violations, Mr. Sogoyou suffered actual damages, including a decreased credit score, embarrassment, humiliation, and other emotional distress.

165.     Shellpoint's violations of 15 U.S.C. § 1681s-2(b)(1)(B) were willful, rendering it liable for damages under 15 U.S.C. § 1681n.

166.     In the alternative, Shellpoint was negligent, entitling Ms. Baza to recover damages under 15 U.S.C. § 1681o.

## COUNT SEVEN:
## VIOLATION OF FCRA, 15 U.S.C. §§ 1681s-2(b)(1)(C) and (D)

167.     Ms. Baza incorporates the preceding allegations.

168.     On one or more occasion within the past two years, Shellpoint violated 15 U.S.C. §§ 1681s-2(b)(1)(C) and (D) by publishing its representations within Ms. Baza's credit files without also including any notation at all that the account was disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

169.    For example, Shellpoint failed to add the "XB" or "XC" code to the CCC (Compliance Condition Code) field of at least one of the ACDV dispute forms when it responded to the credit reporting agencies, which would have indicated that the account was disputed.

170.    In addition, Shellpoint failed to add any other notation that Ms. Baza's account was disputed.

171.    Furthermore, Shellpoint knew that Ms. Baza disputed the subject account through her direct and written disputes letters to the credit reporting agencies.

172.    Ms. Baza's disputes were bona fide as the account reported inaccurate derogatory information.

173.    Because of Shellpoint's violations of 15 U.S.C. § 1681s-2(b)(1)(C) and (D), Ms. Baza suffered concrete and particularized harm, including but not limited to: a reduced credit score, embarrassment, humiliation, and other emotional distress.

174.    Shellpoint's violations were willful, rendering it liable for punitive damages under 15 U.S.C. § 1681n. In the alternative, Shellpoint was negligent, entitling Ms. Baza to recover against it under 15 U.S.C. § 1681o.

175.    Ms. Baza is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Shellpoint under 15 U.S.C. §§ 1681n and 1681o.

WHEREFORE, Ms. Baza demands judgment for actual, statutory, and punitive damages against Shellpoint; her attorneys' fees and costs; prejudgment and post-judgment interest at the judgment rate; and any other relief the Court finds appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**MARTHA BAZA**

By:    _/s/ Kristi C. Kelly_

22

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com

*Counsel for Plaintiff*